**SIGNED THIS: August 13, 2018**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 17-70467 |
| VINCENT J. WALCH and | ) | |
| ALEXIS L. WALCH, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |

## O P I N I O N

Before the Court is an Application for Allowance and Payment of Administrative Expense Claim (#370) filed by Phillip J. Borgic. Because Mr. Borgic failed to establish his entitlement to the allowance of an administrative expense claim at the evidentiary hearing held on the matter, his application will be denied.

### I. Factual and Procedural Background

Vincent J. Walch and Alexis L. Walch ("Debtors") filed their voluntary petition under Chapter 11 on March 27, 2017. They were represented in the filing

by Attorney Douglas Antonik. On their schedules filed April 11, 2017, the Debtors disclosed that Vincent Walch farmed and that Alexis Walch was employed by a local hospital earning approximately $6500 gross per month. The Debtors listed no children or other dependents living in their household, but their itemized expenses included $800 per month for daycare and babysitting. Their total monthly expenses were listed at approximately $9220, and they said that those expenses were paid through Mrs. Walch's wages and the Debtors' "business income."

The Debtors scheduled over $4.9 million owed to secured creditors but acknowledged that many of the secured creditors were not fully secured and that approximately $2.24 million of the $4.9 million would be unsecured if the collateral was liquidated. They also scheduled over $676,000 in additional unsecured debt, much of which appeared to be unpaid farm expenses related to their 2016 crop.

On May 12, 2017, the Debtors filed a motion to incur secured debt from the First National Bank of Nokomis ("Nokomis") in an amount not to exceed $375,286 for the purpose of paying cash rents and obtaining inputs for their 2017 crop. The Debtors proposed to grant Nokomis a first lien on their 2017 crop, crop insurance, and related government payments. The debt to Nokomis was also proposed to be secured by a mortgage on a farm owned by Terri Pope, the mother of Alexis Walch, and, although not specifically disclosed in the motion, the copy of the note attached as an exhibit to the motion showed that Phillip Borgic was a co-signor on the proposed debt. The Debtors claimed in the motion that they had not been able to obtain unsecured credit and therefore needed to have the secured loan

with Nokomis approved in order to farm in 2017.

An objection to the Debtors' motion to incur secured debt from Nokomis was filed by CNB Bank and Trust ("CNB"). CNB asserted that it had a secured interest in both the 2015 and 2016 crops but had not been paid when those crops were sold. It claimed that the Debtors should be required to account for the 2015 and 2016 crop proceeds before borrowing more money and also asserted that the amount proposed to be borrowed exceeded the amount reasonably necessary to meet the Debtors' anticipated needs for rents and crop inputs. CNB argued that no borrowing should be allowed until the Debtors presented a budget for their 2017 farming operation. CNB also filed a motion requesting the appointment of an examiner based on the Debtors' prepetition conduct and a motion seeking to compel the Debtors to appear for an examination under Bankruptcy Rule 2004.

An additional objection to the Debtors' motion to incur secured debt was filed by CHS Capital, LLC ("CHS"). CHS questioned the involvement of Mr. Borgic and Ms. Pope in the transaction and expressed concern that the motion was seeking authority to grant Nokomis a lien superior to the lien already perfected by CHS in the Debtors' property. CHS also requested that a budget be presented before any borrowing was approved.

A hearing on the Debtors' motion to incur secured debt was held May 23, 2017. Attorney Antonik, on behalf of the Debtors, disclosed that, notwithstanding the allegation in their motion to the contrary, the Debtors had obtained unsecured, open credit with a local input supplier, M&M Service Company ("M&M"), so that they could begin planting their crops. He stated that the credit had been extended with the understanding that it would be repaid with funds

from the Nokomis loan after it was approved. Attorneys appearing for both CNB and CHS pressed the issues raised in their written objections and continued to request that additional information be provided before the borrowing was approved. The attorney for the United States Trustee ("UST") also appeared and expressed concern about the Debtors' borrowing on an unsecured basis in anticipation of obtaining a secured loan.

Because of the objections, the Debtors and their attorney agreed to a continuance of the motion to incur secured debt so that the Debtors could appear for an examination and provide more information to the objecting creditors and the UST. Near the conclusion of the hearing, however, Attorney Antonik stepped back to consult off the record with Vincent Walch. The following exchange then took place:

> Mr. Antonik: "As the Court is aware, it is farming season. My client has this understanding with the M&M input supplier that they are advancing him, so he just wanted to make sure he was okay to finish his planting, and it's, again, on unsecured administrative expense basis."

> The Court: "I don't know that I can give him that comfort order. I can't just say . . . I don't know that I can just make a pronouncement that he is good to go."

After Attorney Antonik acknowledged the Court's concerns, the following exchange took place:

> Mr. Antonik: "I guess then maybe I should just say for the record to everyone that my client will plan on continuing to put his inputs in pursuant to his agreement that I have described to the Court to M&M this morning."

> The Court: "And let the chips fall?"

> Mr. Antonik: "I think it's an ordinary course of business and

- 4 -

administrative expense unsecured."

The Court: "Okay. And it may well be. But there is nothing in front of me, there is nothing in front of the creditors' attorneys today to allow us to make any kind of ruling or pronouncement about what positions they might take or how I might look at it down the road."

The hearing concluded with no orders being entered, and the matter was continued for further hearing on June 13, 2017. CNB's motion to appoint an examiner was set for the same date.

After filing their motion to incur secured debt from Nokomis, the Debtors filed an application to employ Phillip Borgic and Borgic Farms, Inc., as their bookkeeper. Attached to the application was a verified statement, signed by Mr. Borgic, asserting that neither he nor his corporation was a creditor of the Debtors, that neither held an interest adverse to the Debtors, and that neither had any connection with the Debtors or other creditors and parties in interest. Neither the application nor the verified statement mentioned Mr. Borgic's involvement in the Nokomis loan or the transactions that now give rise to his request for the allowance of an administrative expense claim.

At the June 13th hearing, the parties reported resolution of several of the pending matters. The Debtors agreed to withdraw their application to employ Phillip Borgic as their bookkeeper, acknowledging that he was not disinterested. The Debtors also consented to the appointment of an examiner. CNB, CHS, and the Debtors agreed to the entry of an order granting the Debtors' motion to incur secured debt from Nokomis in part, with a hearing to be scheduled at a later date on the remaining requested relief. Subsequently, upon further motion by the UST, an order was entered appointing Roger Stone, a certified public accountant with

extensive bankruptcy experience, as examiner. And an agreed order was submitted and entered, authorizing the Debtors to borrow $74,000 from Nokomis to pay rents to landlords, make lease payments to an equipment lessor, and purchase chemical applications for their growing crops. No amount was included in the agreed order for the repayment of unsecured advances for crop inputs; at the hearing, Attorney Antonik reported that the payment of administrative expense claims remained a contested issue.

The examiner's report was filed August 21, 2017. The next day, CNB filed a motion to appoint a trustee, relying on the examiner's findings regarding suspicious, prepetition transfers made by the Debtors, inaccuracies in the Debtors' schedules and financial statements, the commingling of assets among various business entities of the Debtors, the lack of feasibility of the Debtors' ongoing farming operation, and the failure of Vincent Walch to engage in sound business practices. CNB subsequently filed an amended motion containing many of the same allegations. After several interim hearings, the amended motion to appoint a trustee and the remaining request from the Debtors to borrow additional amounts from Nokomis were set for evidentiary hearing on September 19, 2017.

On September 19th, the parties appeared and reported that the pending issues were resolved. They subsequently submitted an agreed order authorizing the Debtors to borrow an additional $118,450 from Nokomis to be used for payment of expenses specifically itemized in the order. An agreed order resolving the amended motion to appoint a trustee was also submitted and entered. That order placed restrictions on how and where the Debtors could store or sell their 2017 crop and required them to sequester the crop proceeds. The Debtors were

required to keep detailed records regarding the crop and to provide records on a weekly basis to their attorney for further distribution to the creditors' attorneys and the UST. In exchange for the Debtors' agreement to the controls, CNB withdrew its amended motion to appoint a trustee without prejudice.

The Debtors filed a motion to pay administrative expenses on October 5, 2017. In their motion, they asked for authority to pay Phillip Borgic $135,602.82 as an administrative expense, claiming that they had obtained crop financing from M&M on the basis that the advances would be paid by Mr. Borgic if an order on their motion to incur secured debt was not obtained in a timely manner. They stated that they had not obtained an order authorizing them to borrow the full amount requested and therefore owed money to Mr. Borgic for his payments for the 2017 crop inputs and cash rent. The attachments to the motion disclosed that Mr. Borgic had paid $28,500 to 4B Farms for rent, $13,612.50 to AgriGold for soybean seed, and $120,715.32 to M&M for other crop inputs.

Both the UST and CNB objected to the motion to pay administrative expenses. The UST expressed concerns about the solvency of the estate and the fact that borrowing from Nokomis had been allowed for the crop inputs without full disclosure of the additional amounts borrowed from Mr. Borgic. CNB asserted that the expenditures could not be appropriately allowed as administrative expenses because Mr. Borgic had incurred the M&M expenses directly on his own account and because he had misrepresented his relationship to the Debtors in his affidavit regarding his company's potential employment as a bookkeeper. CNB also expressed concern about the use of estate resources to prosecute the claim and argued that Mr. Borgic, rather than the Debtors, should have brought the motion.

After several status hearings, the Debtors withdrew the motion without prejudice.

In January 2018, the Debtors finally filed a Chapter 11 Plan and Disclosure Statement. The documents drew objections from the UST, CNB, and other creditors. CNB also filed another motion to appoint a trustee asserting that the Disclosure Statement showed that the Debtors had borrowed approximately $344,000 from Nokomis rather than the $192,450 that had been authorized by the court order. CNB also claimed that the Debtors were not depositing the proceeds from their grain sales into their debtor-in-possession bank account and were otherwise not keeping proper records of their business activities. While these matters were pending, Attorney Antonik filed a motion to withdraw as the Debtors' attorney. Attorney Spencer Desai then filed a motion to substitute as the Debtors' attorney. After the substitution was granted, the Debtors filed a motion to convert their case to Chapter 7, and that motion was subsequently granted. Roger Prillaman was then appointed as the Chapter 7 trustee.

In the meantime, Mr. Borgic retained an attorney and filed his application for the allowance and payment of his administrative expense claim. Mr. Borgic recited in his application that he had been contacted by Vincent Walch after the bankruptcy was filed and asked to provide assistance with financing for the Debtors' 2017 crop. Mr. Borgic asserted that Vincent Walch told him that efforts to obtain financing from a financial institution were in process and that, once that financing was in place, any advances made by Mr. Borgic would be repaid. He claimed that he was owed $175,538.80, which included $28,500 paid in rent to 4B Farms, $13,612.50 paid to AgriGold for bean seed, and $133,406.30 paid to

M&M for various crop inputs.[1] Mr. Borgic asked that he be allowed an administrative expense claim for all of these amounts and that his claim be awarded priority over all other administrative expenses.

CNB objected to Mr. Borgic's application. Hearing on the application was continued several times due to the conversion of the case and the appointment of Trustee Prillaman. An evidentiary hearing on the application was finally conducted on July 18, 2018. Both CNB and Trustee Prillaman appeared in opposition to the application.

Phillip Borgic testified that he is a hog farmer conducting business through several entities, including Borgic Farms, Inc. ("Borgic Farms"). He runs a breed-to-finish hog operation and has a herd of 7000 sows. Mr. Borgic also raises row crops on approximately 200 acres. Mr. Borgic is acquainted with the Debtors because he had been friends with Randy Pope—Alexis Walch's late father—since grade school. Prior to the bankruptcy filing, Borgic Farms sold manure to Vincent Walch, and Mr. Borgic's wife provided bookkeeping services to the Debtors, also through Borgic Farms. Mr. Borgic stated that neither he nor any of his business entities were creditors of the Debtors when the case was filed.

According to Mr. Borgic, Vincent Walch approached him after the bankruptcy filing and asked for assistance with 2017 crop financing. Mr. Walch told him that he had financing lined up, but it was taking time getting authorization from the Court to proceed. Because Mr. Borgic believed that it was important to get the crop planted in a timely fashion and because of his close

---

[1] The three payments made by Mr. Borgic, as listed on his application and accompanying attachments, actually total $175,518.80, not the $175,538.80 amount claimed by Mr. Borgic in his application.

personal relationship with Alexis Walch's father, he agreed to lend money and his credit to the Debtors. Mr. Borgic testified that Vincent Walch assured him that he would be repaid when the secured operating line was approved.

Mr. Borgic identified a seed bill from AgriGold and his check dated April 24, 2017, in the amount of $13,612.50 in payment of that bill. He confirmed that the seed had been delivered to the Debtors and not to him. He also identified his check to 4B Farms dated May 15, 2017, in the amount of $28,500, which he said was a rent payment for ground farmed by Vincent Walch. Mr. Borgic said that he made both payments based on assurances from Vincent Walch that he would be repaid when the secured operating line was approved. He acknowledged that he had not been repaid for either expenditure.

An account statement from M&M was also identified by Mr. Borgic. He acknowledged that the statement showed that he was the account holder, and he said that he had opened the account in his name alone to distinguish it from an account maintained at M&M in the name of Borgic Farms. Mr. Borgic stated that the account statement showed purchases of chemicals, seed, insecticides, and other farm inputs and that all of the purchased items had been ordered by and delivered to Vincent Walch. He identified his check dated July 31, 2017, in the amount of $133,406.30, issued in payment of the M&M statement and acknowledged that he had never been repaid for that amount by the Debtors.

With respect to the loan from Nokomis, Mr. Borgic said that he had guaranteed that obligation of the Debtors because he expected the loan proceeds to be available to repay the moneys he had advanced. He was asked to guarantee the loan by Vincent Walch. To date, no demand has been made on him by

Nokomis to repay any amounts that may remain due on the loan.

Mr. Borgic admitted that he signed the verified statement attached to the Debtors' application to employ him and Borgic Farms as their bookkeeper. He acknowledged that he knew the document was to be used to obtain a court order authorizing his company's employment. He stated that his wife and another employee of Borgic Farms do bookkeeping but that they are not certified public accountants and do not provide auditing services. Rather, they write checks, reconcile accounts, and use a software program to keep farm records. He stated that he had no direct contact with Attorney Antonik, who had drafted the verified statement, yet he signed the statement without reading it.

Under cross-examination by CNB's attorney, Mr. Borgic admitted that Borgic Farms has continued to provide bookkeeping services to the Debtors notwithstanding the withdrawal of the application to employ. He also agreed that he does not regularly lend money in the significant amounts involved here and, through his attorney, stipulated that his lending of money and credit to the Debtors was not done in the ordinary course of his business. He acknowledged that he did not know whether Vincent Walch's inability to finalize his secured operating line was actually due to delay in the legal process or to the fact that the Debtors had not even started the process when he began lending to them. Mr. Borgic admitted that he never followed up to learn the details about the orders ultimately entered allowing the Debtors to borrow reduced amounts from Nokomis.

With respect to the verified statement attached to the application to employ, Mr. Borgic agreed that he had signed the statement but said that he did not read

it before signing. He admitted that, when he signed it on May 5, 2017, he had already paid AgriGold and therefore was a creditor of the Debtors. Under questioning by the Trustee, he acknowledged that he had not sought independent legal advise about entering into the transactions with the Debtors but did realize there was risk involved. He admitted that he and Vincent Walch had no back-up plan in the event sufficient financing was not approved to pay him; he simply accepted Mr. Walch's assurances that he would be paid.

Lynn Eyman was called as a witness by Mr. Borgic. Ms. Eyman testified that, although she is currently employed as a commercial loan officer by CNB, in 2017 she was employed as the credit manager at M&M. Through her work at M&M, she was acquainted with both Vincent Walch and Phillip Borgic. Ms. Eyman identified the M&M statement for the account held in Mr. Borgic's name and said that she was familiar with the transactions made on that account.

Ms. Eyman testified that Vincent Walch approached M&M regarding in-house financing for crop inputs for 2017 and that she had denied him that financing. Instead, Mr. Borgic agreed to be billed for the products delivered to Vincent Walch, and the account in Mr. Borgic's name alone was opened to facilitate that arrangement. She said that, whenever Vincent Walch placed an order, she contacted Mr. Borgic for approval before the order was processed. She confirmed that the M&M statement had been paid in full by Mr. Borgic.

Vincent Walch was the final witness to testify on behalf of Mr. Borgic. Mr. Walch had limited recall regarding when he talked to Mr. Borgic and what conversations they had regarding Mr. Borgic's lending of money and credit to the Debtors. He also struggled to remember the details of his borrowing from Nokomis

and the circumstances under which Mr. Borgic guaranteed the Nokomis loan. He did confirm that the rent paid by Mr. Borgic to 4B Farms was for ground he rented and that all of the farm products from AgriGold and M&M that Mr. Borgic paid for were delivered to him.

Under cross-examination by CNB's attorney, he admitted that, by the time he filed his motion to incur secured debt with Nokomis, he had already borrowed significant amounts from Mr. Borgic. He stated that he had not asked AgriGold, M&M, or any other supplier to extend unsecured credit for his 2017 crop inputs. He acknowledged that he still owed M&M over $270,000 from the 2016 crop year and that he had no realistic expectation that M&M or any other supplier would extend him any further unsecured credit in 2017. He admitted that he knew his borrowing from Nokomis had been limited first to $74,000 and then to an additional $118,450, but he had no recollection of ever informing Nokomis of the court-ordered limits. He also said he could not recall how much he actually borrowed from Nokomis. Under further cross-examination by the Trustee, however, he admitted that he had borrowed more from Nokomis than he had been authorized to borrow and that some of the amounts borrowed had been spent in his tiling and wood-working businesses rather than for farming expenses.

At the close of evidence, Mr. Borgic's attorney presented argument. He admitted that Mr. Borgic's transactions with and on behalf of the Debtors were not in the ordinary course of business. He suggested, however, that the Debtors' transactions with 4B Farms, AgriGold, and M&M were in the ordinary course of business and that, because Mr. Borgic had paid those creditors, he was subrogated to the creditors' rights to claim administrative expense priority. He

cited no authority for that proposition. Both the attorney for CNB and the Trustee asserted that, in order for Mr. Borgic to be awarded administrative expense priority, he was obligated to obtain prior court approval for his transactions, which he did not do. The matter was taken under advisement and is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). A matter involving the allowance or disallowance of a claim against the estate is a core proceeding. 28 U.S.C. §157(b)(2)(B). This matter arises from the Debtors' bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

A trustee, authorized to operate a debtor's business, may generally "obtain unsecured credit and incur unsecured debt in the ordinary course of business[,]" and the credit obtained or debt incurred will be entitled to be paid as an administrative expense. 11 U.S.C. §§364(a), 503(b)(1). When the unsecured credit is not obtained or the debt is not being incurred in the ordinary course of business, repayment may still be awarded administrative expense priority if the trustee, after notice and hearing, has been authorized to incur the debt or obtain

the credit. 11 U.S.C. §364(b). And when no unsecured credit or debt is available under such conditions, a trustee may seek approval, after notice and hearing, to obtain credit or incur debt with administrative expense priority over all other administrative expenses, secured by lien on unencumbered estate property, or secured by a junior lien on estate property subject to a senior lien. 11 U.S.C. §364(c). Chapter 11 debtors-in-possession, such as the Debtors here, have the same rights and powers as a trustee and may therefore obtain credit or incur debt under the same conditions. 11 U.S.C. §1107(a).

Mr. Borgic has not clearly identified the statutory provision he relies on in claiming entitlement to an administrative expense claim. His attorney admitted that his transactions with the Debtors were not in the ordinary course of business, which would seem to preclude reliance on §364(a). But his insistence that Mr. Borgic can be subrogated to ordinary-course-of-business administrative expense claims allegedly held by 4B Farms, AgriGold, and M&M brings that section under consideration. In his application, Mr. Borgic asked that he be granted an administrative expense claim with priority over all other administrative expense claims, thus suggesting reliance on §364(c)(1). But, in closing arguments, Mr. Borgic's attorney asked only for the allowance of an  administrative expense claim without mention of the special priority and therefore may have been relying on §364(b). Although none of the subsections support the allowance of Mr. Borgic's administrative expense claim, each will be briefly discussed.

### A. Phillip Borgic's Administrative Expense Claim is Not Allowable Under § 364(a).

Mr. Borgic admits that his transactions with the Debtors were not in the ordinary course of business; he is a hog farmer, not a banker. But he says that the creditors he paid did extend unsecured credit to the Debtors in the ordinary course of business and that his payment of their claims entitles him to subrogate to their positions. His argument fails, however, because the evidence presented does not support a finding that any of the three creditors he paid extended unsecured credit to the Debtors in 2017.

Lynn Eyman testified that, on behalf of M&M, she denied the Debtors' request for financing for their 2017 crop year. Mr. Borgic then set up an account at M&M in his name for use by the Debtors to buy crop inputs. The documents admitted into evidence and the unequivocal testimony of both Ms. Eyman and Mr. Borgic established that the account was in Mr. Borgic's name alone and that he was solely responsible for payment of the account. The Debtors' names were not on the account, and they signed no documents making either of them liable to M&M for payment of the account. If Mr. Borgic had not paid the account, M&M's recourse would have been solely against Mr. Borgic and not the Debtors. M&M did not extend unsecured credit to the Debtors in 2017 and therefore never had an administrative expense claim against the Debtors in which Mr. Borgic can assert subrogation rights.

With respect to AgriGold, Mr. Walch testified that he never asked AgriGold to extend unsecured credit in 2017. A document admitted into evidence showing the delivery of the bean seed was dated April 24, 2017, and Mr. Borgic's check to

AgriGold was dated the same date. The inference to be drawn from those facts is that the Debtors' terms with AgriGold were cash-on-delivery and that AgriGold never extended any unsecured credit to the Debtors and never had an administrative claim in which Mr. Borgic could assert subrogation rights.

Very little information was presented regarding the rent paid to 4B Farms. Mr. Borgic and Mr. Walch said that all of the expenses paid by Mr. Borgic needed to be paid in order for the Debtors to farm in 2017, and, accordingly, it appears that the rent had to be paid for the Debtors to have access to the ground. No evidence was presented that, absent the rent payment made by Mr. Borgic, 4B Farms would have allowed Mr. Walch to farm their ground or that it would have extended unsecured credit and accepted an administrative expense claim in lieu of the rent payment.[2] Mr. Borgic did not establish the existence of an administrative expense claim held by 4B Farms in which he may claim subrogation rights.

Although Mr. Borgic's attorney cited no authority for his assertion that Mr. Borgic was entitled to an administrative expense claim as the subrogee of the creditors he paid, there is some limited authority for equitable subrogation in the Code. Section 509(a) provides that "an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment."

---

[2] And, in any event, under Illinois law, landlords are granted statutory liens on crops grown on rented ground to secure the payment of rent. 735 ILCS 5/9-316. No evidence suggested that 4B Farms had waived its right to a statutory lien in the event of nonpayment, and it is therefore unlikely that 4B Farms could be found to have extended unsecured credit that would give rise to an administrative expense claim as argued by Mr. Borgic's attorney.

-17-

11 U.S.C. §509(a). The provision applies not only to co-debtors but any "entities which might be jointly or secondarily liable on the debt such as a surety, guarantor, or comaker." *In re The Medicine Shoppe*, 210 B.R. 310, 313 (Bankr. N.D. Ill. 1997) (citations omitted). A key element of equitable subordination is joint liability of the creditor seeking subrogation with the debtor on the debt that was paid; the payment must have been compelled by some joint obligation to pay the debt. *In re Bugos*, 760 F.2d 731, 734 (7th Cir. 1985) (citing *American Surety Co. of New York v. Bethlehem National Bank*, 314 U.S. 314, 317 (1941)).

Mr. Borgic's claim fails under §509(a) because he had no joint liability with the Debtors to any of the creditors he paid. With respect to M&M, he was solely liable on the account that was paid. And with respect to AgriGold and 4B Farms, only the Debtors were liable. Mr. Borgic's payments to AgriGold and 4B Farms were gratuitous and not based on liability on his part to make the payments.

The transactions between the Debtors and Mr. Borgic were not in the ordinary course of business, and Mr. Borgic's claim for payment is therefore not entitled to administrative expense priority on that basis. He also did not establish, as a matter of either fact or law, that his payments to M&M, AgriGold, and 4B Farms provided him with subrogation rights to an administrative expense claim. Mr. Borgic's claim, to the extent asserted under §364(a), must be denied.

### B. Phillip Borgic's Administrative Expense Claim is Not Allowable Under § 364(b) or (c).

If a trustee or debtor-in-possession is unable to obtain unsecured credit in the ordinary course of business, approval may be sought to obtain credit or incur

debt and to grant the lender administrative expense priority or a secured claim. 11 U.S.C. §364(b), (c). But such approval may only be obtained "after notice and a hearing." *Id.* The phrase "after notice and a hearing" means that notice must be appropriate as required by the Rules, but an actual hearing is not required in the absence of an objection or timely request for hearing. 11 U.S.C. §102(1). A final hearing on a motion to obtain credit requires notice of at least 14 days, but an interim hearing to authorize obtaining such credit as may be needed to avoid irreparable injury may be scheduled on shortened notice. Fed. R. Bankr. P. 4001(c)(2); *In re Ockerlund Construction Co.*, 308 B.R. 325, 330 (Bankr. N.D. Ill. 2004).

Here, the Debtors did not seek approval of their transactions with Mr. Borgic before borrowing over $175,000 from him. They did not give the required notice of their intent to incur debt to their creditors and gave none of their creditors or other parties in interest the opportunity to object or be heard on the matter before they borrowed. Neither the Debtors' motion to pay Mr. Borgic filed in October 2017 and later withdrawn nor Mr. Borgic's application now before the Court complied with the requirements of the Code and Rules. These failures alone provide a sufficient basis for the Court to find that Mr. Borgic's application must be denied.

Mr. Borgic's attorney argued, without citation to authority, that this Court may use its equitable powers to fashion a remedy for Mr. Borgic, who, he argues, acted in good faith to help the Debtors. The Court's equitable powers are set forth in §105(a), which provides authority for the issuance of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]."

11 U.S.C. §105(a). But the provisions of §105(a) cannot be used to override or contradict other specific provisions of the Code; to the contrary, the provisions of §105(a) may be used only to "supplement those provisions and fill in gaps and ambiguities[.]" *Ockerlund Construction*, 308 B.R. at 330 (citing *In re Kmart Corp.*, 359 F.3d 866, 871-72 (7th Cir. 2004)). This Court finds no gaps or ambiguities in §364(b) or (c) about the requirement that prior approval after notice and a hearing is required for borrowing outside of the ordinary course of business. Nothing in §105(a) allows this Court to ignore the clear mandates of §364(b) and (c).

Importantly, even courts that have opined that retroactive approval of borrowing may be allowed have placed strict conditions on such approval. Generally, the party seeking retroactive approval must show that extraordinary circumstances existed for the borrowing to have occurred without prior court approval. *See, e.g., Williams v. Pillar Capital Holdings, LLC (In re Living Hope Southwest Medical Services, LLC)*, 450 B.R. 139, 151 (Bankr. W.D. Ark. 2011); *In re Blessing Industries Inc.*, 263 B.R. 268, 274 (Bankr. N.D. Iowa 2001). And where there was time to file a motion and give even shortened notice of a hearing to creditors before the borrowing occurred, the required extraordinary circumstances that would allow retroactive approval of the borrowing simply cannot be found. *Living Hope*, 450 B.R. at 152; *Blessing Industries*, 263 B.R. at 274.

Here, the Debtors filed bankruptcy on March 23, 2017. The trial exhibits suggest that the first advance made by Mr. Borgic occurred on April 24, 2017, when he paid AgriGold. Both Mr. Borgic and Mr. Walch were vague in their testimony about when they first discussed their plans for Mr. Borgic to lend money and credit to the Debtors. But they admitted to multiple conversations

-20-

between themselves and with M&M over what appeared to be at least a several-week period. Nothing in their testimony would support a finding that the Debtors could not have filed a motion between March 23rd and April 24th seeking approval of their borrowing from Mr. Borgic. Absent such a showing, this Court cannot consider retroactive approval of the Debtors' borrowing from Mr. Borgic and cannot retroactively grant him an administrative expense claim under §364(b) or (c)(1).

## IV. Conclusion

The result here is, to some degree, unfortunate. Mr. Borgic lent the Debtors over $175,000 with the belief that the amounts would be promptly repaid. His expectations will not be met, and he may recover little, if any, of the amounts due to him. His intentions were, without question, motivated by a desire to help family friends, and he did not act out of any desire to profit himself. But good intentions are not enough to succeed here.

Mr. Borgic is an experienced farmer and businessman. He presented himself in an articulate, straightforward, and credible manner. Thus, it is hard to understand, his good intentions notwithstanding, why he lent money to a couple in bankruptcy without seeking independent legal advice or otherwise informing himself about what he was getting into by lending to the Debtors. His failures in that regard cause the result here to be, at least in part, of his own making.

Mr. Borgic bought into Vincent Walch's claim that bank financing was being held up because of the long court-approval process even though the Debtors did not commence the process to seek court approval of their Nokomis loan until well

after Mr. Borgic began lending to them. He was told that court approval was needed before the Debtors could borrow from Nokomis but believed, based on conversations with Vincent Walch, that he could lend money to the Debtors without any such approval. He signed the verified statement to be employed as the Debtors' bookkeeper that contained multiple inaccurate representations without reading it, apparently, just because Mr. Antonik had sent it to him and asked him to sign it. Mr. Borgic asks the Court for an equitable remedy, but his total failure to inform himself about the process he was involving himself in suggests that the equities do not run in his favor.

The conduct of Vincent Walch and Attorney Antonik in this matter is also troubling. On May 23, 2017, with Mr. Walch standing at his side, Mr. Antonik represented on the record that the Debtors had an arrangement with M&M to provide crop inputs. Mr. Borgic's involvement in the transaction was not disclosed. Thus, Mr. Antonik's representations to the Court were materially inaccurate. Although it cannot be determined at this point whether the misrepresentation was intentional, it is clear that Mr. Antonik's failure to properly describe the transaction at the time further aggravated Mr. Borgic's position. Had the exact nature of the deal been reported at the hearing, objections might have been raised that could have caused an additional motion to be filed that might have resulted in administrative expense treatment for at least some of Mr. Borgic's claim. In any event, based on the conversations that did occur at the May 23rd hearing, Mr. Antonik and Vincent Walch knew then that neither the creditors' attorneys nor the Court was convinced that whatever deal he had with M&M would automatically entitle M&M to an administrative expense claim. Apparently, however, that

concern was not reported to Mr. Borgic. There is blame to go around for the position Mr. Borgic finds himself in now.

The statutory requirements to obtain court approval before borrowing outside of the ordinary course of business are clear. When a lender expects an administrative expense priority or a secured claim to be allowed for an out-of-the-ordinary-course transaction with a debtor, creditors and other parties in interest must be given notice and an opportunity to be heard on the issue. 11 U.S.C. §364(b), (c). Giving "notice after a debtor has already taken action is generally not meaningful." *Ockerlund Construction*, 308 B.R. at 330 (citations omitted). Mr. Borgic's application for the allowance of an administrative expense claim filed in February 2018 and relating to amounts he advanced to the Debtors outside the ordinary course of business between April and July 2017 must be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###